## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RACHELLIE WELSH,                          )
                                          )
        Plaintiff,                        )
                                          )
        vs.                               )    Civil Action No. 06-1623
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
        Defendant.                        )

## MEMORANDUM OPINION

### I.   INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Rachellie Welsh and Defendant Michael J. Astrue, Commissioner of Social Security.[1] Plaintiff seeks review of a final decision by the Commissioner denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* For the reasons discussed below, Defendant's motion is denied and Plaintiff's motion is granted insofar as she seeks remand for further consideration.

---

[1] Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

1

## II. **BACKGROUND**

### A. Factual Background

Following graduation from high school in 1985, Plaintiff Rachellie Welsh enlisted in the United States Air Force and attended technical school at Shepard Air Force Base, specializing in financial management. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 3, "Tr.," at 204.) After being honorably discharged in 1990, she returned to the Pittsburgh, Pennsylvania, area and enlisted in the Air National Guard, where she worked as budget analyst, managing "a couple million dollar budget." (Tr. 36.) In 1998, while in the active duty reserves, Ms. Welsh sustained a back injury and thereafter, in her words, "started falling apart." (Tr. 204.)

In the spring of 1995,[2] Ms. Welsh had been treated by Dr. Paul Frye for depression following the birth of her second child. Her depression appeared to be in complete remission by 1997, but after her back injury, she returned to Dr. Frye for medication and psychotherapy. (Tr. 173-174.) After she was discharged from the reserves in 2000, Ms. Welsh was employed as a financial manager for an internet firm. Her depression began to increase following foot surgery in November 2000, and by April 2001 had become sufficiently

---

[2] Although the question before this Court, as it was before the ALJ, is the effect of Plaintiff's mental impairments on her ability to work after the modified alleged onset date of September 22, 2002, we provide a brief summary of medical evidence prior to that date in order to establish an historical context.

2

severe that Dr. Frye ordered to her remain off work through at least May 30, 2001. (Tr. 205, 182-183.)

Plaintiff was initially evaluated at a Veterans Administration ("VA") hospital in Pittsburgh on May 22, 2001. (Tr. 203-204.) Her presenting problem was described as "feeling very depressed for several months," along with "increased stress and worry secondary to possibly losing her job because of recent absenteeism." (Tr. 204.) She underwent psychotherapy intermittently at the VA hospital while receiving medication from Dr. Frye until July 2002, when her pharmacologic management was transferred to Dr. Karen Kelly at the VA.

Ms. Welsh continued to receive psychotherapy from Dr. Richard Reardon at the VA and treatment by Dr. Kelly through at least December 2004. Although she occasionally voiced thoughts of suicide and discussed in-patient hospitalization with her physicians on several occasions, Plaintiff continued to live at home with her two teen-age children and did not follow-through on her suicidal comments. As she expected, she had been fired from her internet company job and remained unemployed.

B.  Procedural Background

On March 5, 2003, Ms. Welsh applied for Social Security benefits, claiming disability due to major depression.[3] (Tr. 103-

---

[3] A previous application for disability insurance benefits was denied by an ALJ on September 21, 2002, and rejected for review by the Appeals Council. The United States District Court for the Western District of Pennsylvania (Diamond, J.) affirmed the denial on August

3

106.) The application was initially denied on September 3, 2003 (Tr. 81-82), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ.") (Tr. 87-88.)

On January 5, 2005, a hearing was held before the Honorable Kenneth R. Andrews at which Plaintiff was represented by counsel.[4] Judge Andrews issued his decision on May 16, 2005, again denying benefits. (Tr. 14-25.) The Social Security Appeals Council declined to review the ALJ's decision on October 6, 2006, finding no reason pursuant to its rules to do so. (Tr. 5-7.) Therefore, the May 16, 2005 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on December 4, 2006, seeking judicial review of the ALJ's decision.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of

19, 2004. *See* Welsh v. Barnhart, CA No. 03-1061. Plaintiff does not seek reopening of that application for benefits. Consequently, for purposes of review, the alleged onset date is considered to be September 22, 2002.

[4] An initial hearing was held on July 28, 2004. (*See* Tr. 51-58.) However, because a decision on Ms. Welsh's earlier application for DIB was still pending at the district court level, Judge Andrews continued the hearing until that decision was handed down in order to avoid a "piecemeal situation." (Tr. 56-57.)

4

the Commissioner by bringing a civil action in the district court
of the United States for the judicial district in which the
plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining
whether the Commissioner applied the correct legal standards and
whether the record, as a whole, contains substantial evidence to
support the Commissioner's findings of fact. 42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been
described as requiring more than a "mere scintilla" of evidence,
that is, equivalent to "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson, id.
at 401. "A single piece of evidence will not satisfy the
substantiality test if the [ALJ] ignores, or fails to resolve a
conflict, created by countervailing evidence." Kent v. Schweiker,
710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision
and does not re-weigh the evidence presented to the Commissioner.
Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006),
*citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d
Cir. 1986) (the substantial evidence standard is deferential,

5

including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.)  If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion.  Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  **LEGAL ANALYSIS**

### A.  The ALJ's Determination

To be granted a period of disability and receive disability insurance benefits, the claimant must show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[5] currently existing in the national economy, that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured.  42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).  The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i); Morales v.

---

[5] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

6

<u>Apfel</u>, 225 F.3d 310, 315-316 (3d Cir. 2000). The Commissioner does not dispute that Ms. Welsh satisfied the three non-medical requirements.

To determine a claimant's rights to DIB,[6] the ALJ conducts a formal five-step evaluation:

- (1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;
- (2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;
- (3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;
- (4) if the claimant retains sufficient residual functional capacity ("RFC")[7] to perform her past relevant work, she is not disabled; and
- (5) if, taking into account her RFC, age, education, and past work experience, the claimant can perform other work that

---

[6] The same test is used to determine disability for purposes of receiving either DIB or Supplemental Security Insurance benefits ("SSI.") <u>Burns v. Barnhart</u>, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB applications.

[7] Briefly stated, residual functional capacity is understood as what a claimant can do despite his recognized limitations. More formally, it is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" or as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling 96-8p, "Assessing Residual Functional Capacity in Initial Claims;" <u>see also</u> 20 C.F.R. § 404.1545.

7

> exists in the local, regional or national economy, she is
> not disabled.

20 C.F.R. § 404.1520; *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[8] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Andrews first concluded that Ms. Welsh had not engaged in substantial gainful activity since her amended onset date of September 22, 2002.[9] (Tr. 24.) Resolving step two in Plaintiff's favor, the ALJ found that her severe impairments included depression, anxiety disorder, and torn ligaments in her right wrist. (Tr. 16.) At step three, the ALJ rated depression as her "primary problem," but found that all three impairments were "so far from meeting or equaling any of the Listed Impairments, it is sufficient to state simply that they fail to meet any of the basic requirements for the respective Listings

---

[8] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

[9] The evidence shows that Plaintiff had attempted to work as a baby-sitter in her home during 2003. The attempt, however, was short-lived because, as she testified, she "wasn't able to be responsible, wasn't even able to stay awake [and] wasn't able to get along with parents [or] prepare meals" due to "the stress, and the pressure, and taking the medicines [she] was taking." (Tr. 34.)

of 12.04 and 12.06 and the 1.00 Listing Series."[10]  (Tr. 16.)

At step four, the ALJ concluded that Ms. Welsh retained the residual functional capacity to perform simple, routine, repetitive light work[11] that required only occasional contact with the public, co-workers and supervisors and could be performed in a low stress environment, i.e., one which consisted "of a work atmosphere in which she must avoid any type of production goals and in which she must make only few work-related decisions." (Tr. 17.) He further concluded that due to her combination of exertional and non-exertional limitations, particularly her mental impairments, she could not perform any of her past relevant work as a child care worker or in finance-related jobs, which the vocational expert ("VE") at the hearing, Samuel Edelman, had described respectively

---

[10] Standing alone, the ALJ's failure to systematically address the complex criteria of Listings 12.04, affective disorders, and 12.06, anxiety-related disorders, could be sufficient reason to remand for further analysis. See Smith v. Barnhart, No. 02-1675, 2002 U.S. App. LEXIS 25441, *8 (3d Cir. Dec. 9, 2002), rejecting the ALJ's "mere conclusory statement" that the claimant did not meet the listings, and requiring him to articulate how he came to his decision in step three, adequately identify the evidence he relied on in reaching that decision, identify the specific listing or listings he considered, and discuss medical equivalence or identify which elements were missing from which criteria of the listing.

[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

9

as light unskilled and sedentary semi-skilled to skilled work. (Tr. 23; *see also* Tr. 45-46.)

In response to the ALJ's hypothetical question at the hearing, Mr. Edelman had testified there were numerous light-level jobs such as stock clerk, office cleaner, and hotel/motel cleaner[12] which an individual of Ms. Welsh's age, education, and impairments could perform in the local or national economy. (Tr. 23; *see also* Tr. 47.) Based on Plaintiff's status as a younger individual[13] for whom transferability of skills was not an issue; "a high school (or high school equivalent) education;" the medical evidence of record; and the testimony of Plaintiff and the VE, the ALJ determined at step five that Ms. Welsh was not disabled and, consequently, not entitled to benefits. (Tr. 23-24.)

B. Plaintiff's Arguments

Plaintiff raises three arguments in the brief in support

---

[12] In his decision, the ALJ referred to the last position as "hotel clerk," contrary to Mr. Edelman's testimony. (*Compare* Tr. 23 and 47.) Mr. Edelman also testified that the descriptions of these jobs were consistent with those in the *Dictionary of Occupational Titles* ("DOT.") (Tr. 47.) Since no job identification numbers were provided, it is impossible to ascertain exactly which jobs the VE had in mind, but it appears, based on the Court's review of the DOT, that the job of stock clerk (clerical) and stock clerk (retail trade), 222.387-058 and 228.367-014, respectively, are both "heavy" jobs with a specific vocational preparation ("SVP") rating of 4. *See* DOT, revised 4th edition, provided by the U.S. Department of Labor at www.occupationalinfo.org (last visited November 2, 2007.) SVP ratings of 3 and 4 are associated with semi-skilled, not unskilled, jobs. *See* Boone v. Barnhart, 353 F.3d 203, 207 (3d Cir. 2003).

[13] Plaintiff was 35 years old on the amended disability onset date and 37 at the time of the hearing, making her a "younger" person according to Social Security regulations. 20 C.F.R. §§ 404.1563(c).

10

of her motion for summary judgment. ("Plf.'s Brief," Doc. No. 6.) First, she argues that the ALJ improperly relied on a consultative report provided by Dr. Marvin D. Wheeler who examined her only on June 23, 2003. Not only did the ALJ misinterpret Dr. Wheeler's remarks, he erroneously gave greater weight to his opinion than to that of Plaintiff's long-term treating physician, Dr. Kelly. (Plf.'s Brief at 6-7.)

Second, the ALJ improperly considered Plaintiff's ability to work in a "low stress environment." Although he defined the term in his hypothetical question, he failed to take into account how she might respond to such an environment due to her mental limitations. Consequently, the "vague hypothetical" does not provide substantial evidence to support his decision. (Plf.'s Brief at 7-8.)

Finally, the ALJ substituted his own opinion for that of the treating physician by interpreting Dr. Kelly's notes in such a way as to indicate that Plaintiff's condition had improved, which was not the case. Again, the ALJ erroneously rejected Dr. Kelly's findings by relying on Dr. Wheeler's out-of-date opinion and ignoring evidence that after his one-time examination, Plaintiff's condition deteriorated severely. (Plf.'s Brief at 9-11.)

Because we conclude that the ALJ erred by failing to give proper relative weight to the opinions of Drs. Kelly and Wheeler and erroneously substituted his own lay opinion for that of

11

Plaintiff's psychologists, we need not consider the second argument. We turn first to the well-established law pertaining to the relative weights an ALJ is directed to give to the opinions of various medical sources.

Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. 20 C.F.R. § 404.1502. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with her are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with her, for example, a one-time consultative examiner. Id. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. Id.

The regulations carefully set out the manner in which opinions from different medical sources are to be evaluated. 20 C.F.R. § 404.1527(d). In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating

sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) Id.; *see also* Fargnoli v. Halter, 247 F.3d 34, 43(3d Cir. 2001), and Sykes, 228 F.3d at 266, n.7. The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).

Where a treating physician's opinion conflicts with other medical evidence, the ALJ may give that opinion less than controlling weight or even reject it, but must clearly explain his reasoning for doing so. Salles v. Comm'r of Soc. Sec., No. 06-2799, 2007 U.S. App. LEXIS 15304, *17-*18 (3d Cir. June 26, 2007), *citing* Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991). If the ALJ declines to give controlling weight to a treating source's opinion, it is evaluated and weighed according to the four standards set out in the previous paragraph. Salles, id. at *18.

In this case, the record contains medical evidence from three sources in addition to Dr. Frye's notes; the latter are irrelevant

13

to our analysis because they all date from before the revised onset date of September 22, 2002. The most extensive records are those from the Veterans Administration hospital for the period August 2001 through December 2004, consisting largely[14] of notes by Dr. Kelly, who prescribed medications, diagnosed Plaintiff's mental impairments and provided some counseling, and by Dr. Reardon, Plaintiff's psychotherapist. On June 23, 2003, Dr. Wheeler, a one-time consulting psychologist, interviewed Ms. Welsh and reviewed Dr. Frye's records from September 2001 through July 2002 and VA records from March 10 and March 24, 2003.[15] Finally, Dr. Sanford Golin performed a file review on August 20, 2003. The ALJ recognized each of these three sources and analyzed their reports, relying extensively on the conclusions of Dr. Wheeler for his ultimate finding that Ms. Welsh was not under a disability at any time between September 22, 2002, and the date of his opinion, May 16, 2005.

Dr. Wheeler reported his findings regarding Ms. Welsh in a letter dated June 28, 2003. (Tr. 245-250.) Briefly stated, the

---

[14] Like Judge Andrews, this Court will ignore evidence pertaining to medical conditions which Plaintiff did not contend were severe impairments. We find the ALJ's evaluation of Plaintiff's right dorsal wrist ganglion or tear somewhat brief (Tr. 22), but inasmuch as Plaintiff does not raise any objections thereto, we do not discuss that impairment further.

[15] There is no explanation why Dr. Wheeler reviewed Dr. Frye's records, all of which preceded Plaintiff's modified onset date, but did not review the entire psychological treatment record from the VA hospital which began when Ms. Welsh was initially evaluated on May 22, 2001. (Tr. 203.)

14

relevant points from his report are as follows:

- Ms. Welsh was "basically cooperative and considered a fair historian" although she provided minimal information and only responded to direct questions.

- She stated she suffered from "depression and anxiety with suicidal and homicidal urges;" when asked to describe those urges, she reported thoughts of "wishing things were over" but denied any plan or intent because she "wouldn't want the children to have to live with that."

- Ms. Welsh denied in-patient hospital treatment, commenting that she could not be admitted because there was no one to care for her children.

- In discussing her work history, she stated she had "no trouble getting a job – just keeping a job" because she had "anxiety attacks, going in late sometimes, can't leave home – can't get out the door."

- She was "evasive" about her daily activities, stating that she could not cut the grass and would "lay around, read magazines, talk on the phone, have stomach aches and throw up."

- Ms. Welsh reported she did not have any hobbies, did not drive, had no legal problems, and did not socialize outside the home, stating she did not attend church, for instance, because there were "too many people and they touch you and hug you and I feel closed in."

- During the interview she sat in a sideways position, avoiding eye contact, at times with her hands in her face, gazing at the floor.

- Her response time to questions was "very slow," with speech "barely above a whisper," but no language impairments were noted.

- She denied perceptual disturbances, delusional thinking, or problems with control of hostile or aggressive impulses.

- Dr. Wheeler described Plaintiff's affect as "indifferent;" her thought processes as slow and hesitant; her ability to think in abstract terms as "poor and reflective of one who is concrete in her thinking;"

15

her general fund of information as deficient and inconsistent with someone who had a master's degree and had served in the military for 16 years.

- She reported problems with concentration and was unable to quickly subtract in serials of seven; she was oriented to time, place, and person; her "memory for remote, recent past and recent events appeared intact, although she gave the impression of withholding some information."

- Her social judgment was not suggestive of behaviors which would be harmful to herself or contrary to acceptable behavior in the community, but her test judgment was questionable.

- Plaintiff's insight was "considered fair as she recognizes a problem and is reportedly in treatment," but her "veracity for reporting her situation seemed questionable at times."

(Tr. 245-248.)

Dr. Wheeler concluded:

Based on a review of the medical referral information and her responses to questions during this evaluation the claimant's mental impairment is apparently having some impact on her ability to perform daily activities on a sustained basis. . . . Ms. Welsh, based on her reported educational and vocational background, should have the capacity to understand and follow instructions and to sustain attention to perform simple repetitive tasks. However, her level of depression is seemingly interfering with her ability to follow through on routine activities. At this point in time she does not appear capable of tolerating the stress and pressures associated with day to day work type tasks, but this could change as her treatment continues.

(Tr. 248.)

Attached to Dr. Wheeler's report are two pages from a form document[16] in which he responded to questions by checking boxes

---

[16] Transcript pages 249-250 are identified as pages 6 and 7 of 7 pages, but pages 1 through 5 of this document are not in the record.

16

which indicate the level of a claimant's restrictions in particular areas using a scale of "none," "slight," "moderate," "marked," or "extreme." (Tr. 249-250.) None of these terms is further defined. Dr. Wheeler indicated that Ms. Welsh would have slight restrictions in her ability to understand, remember and carry out short time instructions, moderate ability to make simple work-related decisions, and marked restrictions in her ability to understand, remember, and carry out detailed instructions due to her difficulty with concentration. He also indicated moderate restrictions in her ability to interact appropriately with the public, supervisors and co-workers, but marked restrictions in responding appropriate to pressure or change in a work setting. (Tr. 249.)

The ALJ first noted that while Dr. Wheeler agreed with the VA physicians that Ms. Welsh had major depression,

quite important to the disposition of the case at hand, Dr. Wheeler's conclusions and findings regarding the limitations that the claimant would experience because of her major depression are entirely consistent with my finding regarding the claimant's residual functional capacity as found herein; therefore, Dr. Wheeler's assessment provides the basis for the testimony of the vocational expert that the claimant has not been under a disability at any time herein since September 22, 2002.

(Tr. 18.)

The Court finds this conclusion disturbing for two reasons. First, the statement that Dr. Wheeler's conclusions are "entirely consistent" with the ALJ's findings with regard to her RFC seems to put the cart before the horse. That is, Dr. Wheeler's conclusions

17

should have been identified as the basis for the ALJ's RFC analysis; as stated, the implication is that the ALJ arrived at his RFC conclusion and then found support for it in Dr. Wheeler's report. This leads in turn to the question of what evidence the ALJ did rely upon to draw his conclusion regarding Plaintiff's RFC if it was not Dr. Wheeler's opinion.

Second, based on our review of the record, it is entirely incorrect that "Dr. Wheeler's assessment provides the basis for the testimony of the vocational expert that the claimant has not been under a disability at any time herein since September 22, 2002." The Vocational Expert did not opine at the hearing as to the severity of Plaintiff's disability and, as a matter of policy, such testimony would have been inappropriate. The VE's role at a hearing is to provide evidence on which the ALJ will base his conclusions at steps four and five of the analysis, that is, to describe the claimant's past work in terms of its exertional and non-exertional limitations, to provide an opinion on the claimant's ability to return to that work, and, in response to hypothetical questions posed by the ALJ and the claimant, to opine on the availability of other work in the national and local economies which the claimant could perform despite her limitations. *See* Social Security Ruling[17] ("SSR") 00-4p, "Use of Vocational Expert

---

[17] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228

18

and Vocational Specialist Evidence and Other Reliable Occupational Information in Disability Decisions." The question of whether a claimant is or has been under a disability is reserved to the Commissioner (*see* 20 C.F.R. § 404.1527(e)), and is not within the a vocational expert's purview.

The ALJ also cited Dr. Wheeler's finding that Plaintiff's ability to tolerate stress as of June 2003 "was so limited that the claimant appeared to be unable to handle work on a daily basis," but noted that Dr. Wheeler had "definitely stated" Plaintiff's ability to tolerate stress "could change as her treatment continues." (Tr. 19.) We find the ALJ's reliance on these statements troubling as well. First, Dr. Wheeler's statement is based on a single interview conducted in June 2003 and his review of reports compiled no later than March 24, 2003. Therefore, to the extent his conclusions are based on other medical records, many (i.e., those of Dr. Frye) date from before the alleged onset date and are relevant only for the historical perspective they provide, while the VA records pertain to only one month out of the 28 months of treatment to be considered in determining Plaintiff's mental condition after September 22, 2002. Logically, Dr. Wheeler's opinion could not, therefore, provide substantial support for the

F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

ALJ's conclusion that Ms. Welsh was not under a disability *at any time* between September 2002 and May 2005. Second, Dr. Wheeler's statement that Plaintiff's ability to tolerate stress "could change as her treatment continues," which the ALJ read as implying improvement, is no more than a theory. In fact, one could argue that her ability to tolerate stress actually decreased between June 2003 and December 2004 as evidenced by her increasing levels of medication, the emergence of paranoiac symptoms, her repeated discussions of in-patient hospitalization, and her increased reliance on others for performing activities of daily living, all of which are reflected in the notes of Drs. Reardon and Kelly. Therefore, because Dr. Wheeler's hypothesis cannot be considered substantial evidence, to the extent the ALJ relied on this statement, such reliance is unfounded.

A second medical opinion was provided by Dr. Golin who performed a file review on August 20, 2003. (Tr. 298-315.) Although not explicitly stated anywhere in his report, Dr. Golin appeared to have considered Dr. Wheeler's report and the documents on which he in turn had relied, even though the VA medical records include notes from five more psychotherapy sessions between March 24 and August 1, 2003. (Tr. 272-278.) Dr. Golin found that medical evidence supported the conclusion that Ms. Welsh suffered from recurrent episodes of major depressive disorder (Tr. 301), but considered these allegations only "partially credible" (Tr. 314),

a seemingly inconsistent conclusion which is not explained either in his own notes or by the ALJ. Dr. Golin gave "great weight" to Dr. Wheeler's conclusion that her depression "had only a slight effect on her ability to carry out simple, repetitive tasks." (Tr. 314.) He also found that Ms. Welsh was no more than moderately limited in any of the mental activities associated with working a normal workday and workweek on an ongoing basis, except for her ability to carry out detailed instructions which he considered markedly limited. (Tr. 312-313.) Nor was she more than moderately limited in her activities of daily living, ability to maintain social functions, and ability to maintain concentration, persistence or pace. (Tr. 308.)

The ALJ stated that he accepted Dr. Golin's disability determinations "to the extent that they are consistent with my finding regarding the claimant's residual functional capacity herein." (Tr. 20.) Again, this statement leaves the Court wondering what evidence the ALJ used to determine Plaintiff's RFC if he did not rely on evidence provided by Dr. Golin. And, as with Dr. Wheeler's opinion, Dr. Golin's conclusions are based on a seriously incomplete record.

The ALJ does not identify the "overall evidence of record" with which the opinions of Dr. Golin and Dr. Wheeler are consistent. They are clearly not consistent with the opinions of

Drs. Kelly and Reardon, nor with Plaintiff's testimony[18] and the questionnaire pertaining to her activities of daily living.[19] Thus, we conclude the ALJ erred by finding that their opinions were consistent with the medical evidence of record when the records on which those opinions were based were notably incomplete, particularly with regard to the exacerbations of her mental impairments which occurred in July through September 2004 (discussed below.) *See* Cadillac v. Barnhart, No. 03-2137, 2003

---

[18] *See*, e.g., testimony at Tr. 33, stating that her mental problems made it impossible for her to maintain gainful employment, get along with others, concentrate, or maintain a regular schedule, she believed she was not "really getting any better," and in the "past couple of years [it] seems like I'm progressively getting worse;" and at Tr. 42, stating that her parents and uncle helped with the care of her two sons, she did not do chores around the house, and her 16-year old son helped with writing checks.

[19] *See* questionnaire at Tr. 164-170. We find it troubling that the only activities of daily living to which the ALJ explicitly referred in his opinion are Plaintiff's ability to care for her children and to "handle[] money without any problem." (Tr. 18 and 19.) As one Court of Appeals has pointed out, the fact that a parent takes adequate care of her children may be the result of "heroic efforts" and that providing such care has "a degree of flexibility that work in the workplace does not." Gentle v. Barnhart, 430 F.3d 865, 867-868 (7th Cir. 2005). *See also* SSR 85-15: "Capability to Do Other Work — The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments," commenting that "Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day care programs, social work programs and similar assistance. . . . The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day." Moreover, there is some question as to how well or independently Ms. Welsh handled money. She testified that although she could do the "simple math" necessary to balance her checkbook, her older son "watches the bills, tells me how much the checks need to be." (Tr. 42, 49; *see also* questionnaire at Tr. 166, indicating that she can only manage her bills on "a good day" and that if she asks for help from relatives, she believes they steal from her.)

22

U.S. App. LEXIS 24888, *15-*16 (3d Cir. Dec. 10, 2003), holding that the ALJ erred by favoring state agency examiners' conclusions over treating physicians' opinions based on later, more complete medical records, as well as a hands-on examination;[20] Morales, 225 F.3d at 320, remanding in part because the ALJ erroneously relied upon state agency reports prepared from a review of an incomplete record which did not include treating physician assessments directly undermining the conclusions drawn by the state agency doctors; and Hippensteel v. SSA, 302 F. Supp.2d 382, 393-394 (M.D. Pa. 2001), noting that where a non-examining source based his conclusions on an incomplete record, "vague references to the record as a supporting explanation for his opinion cannot be given great weight."

Pursuant to established law, the greatest weight should have been given to the opinions of Drs. Reardon and Kelly. The Third Circuit Court of Appeals has consistently held that

---

[20] In Cadillac, two state agency physicians reviewed the claimant's medical records in 1996, each concluding he was capable of engaging in light activity. 2003 U.S. App. LEXIS 24888 at *4-*5. After those assessments were completed, Cadillac's back condition was evaluated on three separate occasions in the next year by orthopedic surgeons. In her decision denying disability insurance benefits, handed down in February 1998, the ALJ gave controlling weight to the state agency physicians' reports and "minimal" weight to the orthopaedists' opinions. Id. at *8-*9. On appeal from the district court's opinion affirming the ALJ's decision, the Third Circuit Court of Appeals noted that the fact the state agency physicians had completed their assessments in 1996 meant they did not have an opportunity to consider significant medical events which did not occur until in 1997 and thus their opinions should not have been given controlling weight.

23

> Treating physicians' reports should be accorded great
> weight, especially when their opinions reflect expert
> judgment based on a continuing observation of the
> patient's condition over a prolonged period of time. An
> ALJ may reject a treating physician's opinion outright
> only on the basis of contradictory medical evidence, but
> may afford a treating physician's opinion more or less
> weight depending upon the extent to which supporting
> explanations are provided.

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (internal
quotations and citations omitted).

Both Dr. Reardon and Dr. Kelly were specialists in the field
of psychology or psychiatry who treated Ms. Welsh on a regular
schedule for a period of more than three years. Their records
cover the period from November 2001 through December 13, 2004, less
than a month before the hearing. Their notes are detailed,
providing not only a summary of the conversations between Ms. Welsh
and the physician, but also clinical observations about her affect,
orientation, mood, conversation, insight, judgment, and memory, as
well as the presence or absence of psychotic symptoms, suicidal
ideation or homicidal ideation. We agree, as Plaintiff argues,
that the ALJ erred by both failing to give proper weight to their
opinions and by applying his own medical judgment when interpreting
their notes. We discuss only one example of each type of error,
beginning with the weight which should have been given to Dr.
Kelly's evaluation of Plaintiff's RFC.

On June 24, 2004, Dr. Kelly completed a document entitled
"Supplemental Questionnaire on Residual Functional Capacity of the
Mentally Impaired Claimant." Although not identical to the

24

questionnaires completed by Dr. Golin and Dr. Wheeler, this questionnaire asked Dr. Kelly to evaluate the extent to which Plaintiff's impairments affected her ability to understand and remember, her social inactions, sustained concentration and persistence, routine functions, and responses to stress, including the stresses of the workplace. Dr. Kelly was asked to rate Plaintiff's impairments as "none," "mild," "moderate," "marked," or "extreme." (Tr. 348-353.)

The Court finds no errors in the ALJ's summary of Dr. Kelly's responses and therefore will not reiterate his findings here. (*See* Tr. 21.) But, having noted that Dr. Kelly reported marked[21] limitations in Plaintiff's ability to interact appropriately with supervisors, co-workers and the public and in her ability to perform routine tasks without inordinate supervision, the ALJ concluded:

> Nevertheless, I find that although the claimant had marked limitations in the aforementioned categories, the evidence of record is consistent with my finding regarding the claimant's ability to have only limited interaction with the public, co-workers, and supervisors.

(Tr. 21.)

---

[21] "Marked" is defined in the questionnaire as "an impairment that seriously affects the Claimant's ability to function independently, appropriately and effectively." (Tr. 348.) This parallels the definition used in Listing 12.06 which defines "marked" as "more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C).

25

The Court is left again with the unanswered question, "What evidence of record?" Dr. Wheeler did not opine on this subject except to note that when Ms. Welsh tried to have her own child-care business, she had to give it up "because of a problem with a parent" and to quote Plaintiff as saying she had "no trouble getting a job – just keeping a job." (Tr. 246-247.) Dr. Golin did not address this subject at all except to check the box indicating Plaintiff had no more than moderate limitations in maintaining social functioning. Ms. Welsh testified that her mental problems made it impossible for her to maintain gainful employment, get along with others, or maintain a regular schedule (Tr. 33) and that she stopped her childcare business in part because she "couldn't get along with the parents, came across too short or too rough" (Tr. 34.)

Similarly, the ALJ discounted Dr. Kelly's conclusions that Plaintiff had marked limitations in completing sequential tasks, performing a normal 8-hour workday without psychologically-based interruptions, working according to a plan, performing routine work and dealing with customary work pressures; she also found that Ms. Welsh would have extreme[22] limitations in completing tasks over an 8-hour day for a number of weeks without frequent absences. (Tr. 21.) The ALJ stated:

---

[22] "Extreme" is defined in the questionnaire as "an impairment that causes a drastic limitation in the Claimant's ability to function independently, appropriately, and effectively." (Tr. 348.)

26

I find that the overall evidence of record is more consistent with a finding that, although the claimant definitely has limitations in her ability to maintain a task and withstand stress, the overall evidence of record, particularly as evaluated by the consultative examining physician, Dr. Wheeler, whose opinion I give great weight herein since it is the opinion that is most consistent with the overall evidence of record, the claimant's limitations from stress are only such that she must work in a low-stress environment, which precludes her from having to deal with any production goals and which does not require that she make any work-related decisions or, if any, very few.

The overall evidence of record simply does not substantiate the marked and extreme limitations found by Dr. Kelly which, in essence, preclude the claimant from performing competitive work; that is, there is no evidence of record that the claimant cannot, within the confines of her residual functional capacity as found herein, perform work that would allow her to work 5 days a week, 8-hours a day, and 40 hours a week as long as she stays within the confines [of] the residual functional capacity as I have found herein.

(Tr. 21-22.)

As noted above, contrary to the ALJ's finding, Dr. Wheeler did not evaluate "the overall evidence of record." To the extent that Dr. Wheeler evaluated Plaintiff's ability to withstand stress, he concluded:

Ms. Welsh, based on her reported educational and vocational background, should have the capacity to understand and follow instructions and to sustain attention to perform simple repetitive tasks. However, her level of depression is seemingly interfering with her ability to follow through on routine activities. At this point in time she does not appear capable to tolerating the stress and pressures associated with day to day work type tasks, but this could change as her treatment continues.

(Tr. 248.)

27

Dr. Wheeler most definitely did not opine that Ms. Welsh could work in a low-stress environment with no production goals and little or no work-related decision-making as the ALJ implies. More precisely, he stated although her level of education and work experience *should* allow her to perform simple repetitive tasks, her depression interfered with her ability to "follow through on *routine* activities" and she did not seem able to tolerate the stress and pressures of work-type tasks. These conclusions are consistent with, if not as definitive, as Dr. Kelly's conclusion a year later that Ms. Welsh was drastically limited in her ability to perform routine tasks on a sustained basis over a period of time without frequent absences, and seriously limited in a number of other abilities associated with working in a competitive environment.

The ALJ never explicitly stated what "overall evidence of record" contradicted Dr. Kelly's opinions that Ms. Welsh experienced marked and extreme limitations in her ability to perform competitive work. However, in addition to several points addressed elsewhere herein,[23] Defendant argues that such medical evidence consists of Plaintiff's GAF score of 60 and the fact that

---

[23] These arguments include Dr. Wheeler's conclusions that she could perform simple, repetitive tasks and that her ability to tolerate work stress could change if her treatment continued, as well as Dr. Golin's expert opinion, all of which the Court has previously addressed. Defendant's third argument, that under the care of Drs. Kelly and Reardon, Ms. Welsh's condition "markedly improved," is addressed below in the discussion of the ALJ's substitution of his own medical judgment for that of Plaintiff's physicians.

under the care of Drs. Kelly and Reardon, Plaintiff was able to cope with the sources of stress in her life. (Defendant's Brief in Support of [His] Motion for Summary Judgment, Docket No. 8, at 12.) The Court is not persuaded by these arguments.

The Global Assessment of Functioning or "GAF" score is a measurement used to assess how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002). As Defendant points out, a GAF score between 51 and 60 reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social [or] occupational . . . functioning (e.g., few friends, conflicts with peers or co-workers)." See the on-line version of *Diagnostic and Statistical Manual of Mental Disorders*, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited November 1, 2007. The GAF score to which Defendant refers was provided by Dr. Wheeler in June 2003 (Tr. 248), and neither Dr. Reardon nor Dr. Kelly provided such scores anywhere in their treatment records. Thus, Dr. Wheeler's assessment is a single data point that may or may not reflect Plaintiff's condition over the entire period under consideration. Social Security regulations and case law do not require (or permit) an ALJ to determine a

29

claimant's disability based solely on her GAF score. *See* Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

In support of his argument that under the care of Drs. Kelly and Reardon, Plaintiff was "able to cope with the sources of stress in her life," Defendant cites Tr. 334, Dr. Kelly's notes from December 2, 2003. On that date, Ms. Welsh was seen "as an emergency walk-in," stating that she had "not been doing well with the numerous challenges she faces day to day." She was concerned about "arguments and power struggles" with her older son and about a recurrence of her younger son's serious medical symptoms. Plaintiff reported "intermittent sleepless nights and then periods when she is incapable of getting out of bed. She is anxious, irritable, and wonders if she is losing her mind." Dr. Kelly did, in fact, note, "we discussed how well she is actually doing with her major stressors." But Defendant's argument that this statement is evidence that Plaintiff was "able to cope with the sources of stress in her life" is unreasonable, particularly when coupled with the fact that Dr. Kelly prescribed a new anti-anxiety medication that day.

The Court is unable to conclude that the ALJ's vague allusion to the "overall evidence of record" reflects substantial evidence that Plaintiff's RFC was sufficient to allow her to work in a competitive environment, even under "low-stress" conditions.

30

Moreover, although we conclude that Dr. Kelly's and Dr. Wheeler's opinions in that regard are essentially consistent, to the extent they differ, Dr. Kelly's opinions should have been given greater weight based on her status as Plaintiff's treating physician for more than three years. Thus, we find this problem alone is sufficient reason to remand the case for reconsideration.

Turning to the second error alleged by Plaintiff, we agree that the ALJ misconstrued the medical evidence and/or substituted his own medical judgment in places. Again, we discuss only one such instance in detail.

Referring to the medical records from July 7 through October 2, 2004, the ALJ wrote:

> although the record indicates that the claimant experienced an aggravation of her signs and symptoms of depression in September 2004, the evidence of record indicates that the claimant so quickly recovered from her increased depression that, from September 17, 2004. . . to September 23, 2004 . . . essentially only one week, a mental status examination revealed that the claimant was essentially normal. Indeed, the evidence of record indicates that the claimant's increased depression was only brief, situational, and that any limitations that she might have experienced from her increased depression were only temporary and not consistent with her overall residual functional capacity as found herein.

(Tr. 22, referring to Exhibit B-13F.)

To set the reports of September 17 and September 23, 2004, in context, we need to consider Dr. Reardon's notes from September 15, 2004. He wrote that during an

> acute period of depression about 10 days ago, when [Ms. Welsh] was feeling suicidal, she got out a knife and

31

instead of cutting her wrists as she felt impelled to do, she began cutting her hair with it. There had been no clear impetus for this except that she felt worthless because she had decided that her health problems prevented her from volunteering in her children's schools as she hoped to do. She said she had earlier told her father and uncle that she felt like driving her car into an ocean if she had lived near one. . . . We spent much of the session discussing the advisability of psychiatric admission for her. She said that she is not opposed to this, but the idea seemed to frighten her to some extent as she wondered "Maybe they would never let me go." The main barrier to her coming into the hospital is that she needs to find someone to take care of her children in her absence. She thought that she could trust their care to her father and his brother. She said that she would discuss this with them today. . . .There were no evident psychotic symptoms but she said that she has been feeling "paranoid" and worries in an obsessive way about intruders. She said that she often hears "murmurs" which she takes to be people who have broken into her house; she said that she is continually checking her house to make sure that no one has broken in.

(Tr. 389-390.)

Dr. Reardon alerted Dr. Kelly to the hair-cutting episode and the discussion of in-patient treatment. (Tr. 388.) Plaintiff continued to discuss hospitalization in a session with Dr. Kelly on September 17, 2004. The psychiatrist described Plaintiff as "overwhelmed," with increased fear and hyper-vigilance during the day, which was "very upsetting to her." She reported Plaintiff was

awake most of the night, fearful and responding in a panic to every little noise. In addition, her auditory hallucinations have worsened. She is exhausted and feeling more hopeless. Fortunately, her paternal uncle has come to the rescue. He has been very helpful to the patient this past week, working around the house, setting limits with the boys, supporting the patient. She has discussed with both her father and her uncle the possibility that she may need to come into the hospital and they have agreed to look after her boys. On exam,

32

the patient is very well groomed in bright, stylish, casual clothing. She has had a friend help her re-style her hair. . . . She was tearful during the exam and was ambivalent about coming into the hospital. I was very clear with her that if the medication changes that we try this weekend do not make a major change for the patient, then she is to come into the hospital. She agreed to do this.

(Tr. 388-389.) Dr. Kelly increased Plaintiff's quetiapine dosage and directed her to continue taking venlafaxine, topimax, trazodone, lorazepam, and temazepam,[24] and return in ten days. (Tr. 389.)

Plaintiff actually returned to the VA in just six days. Dr. Reardon wrote on September 23, 2004:

Ms. Welsh, who seemed reluctant to report that she feels better ("I feel different"), nevertheless appeared to be markedly improved since our last meeting [on September 15]. She. . .continues to have "paranoid" thoughts, thinking that people are lurking outside her home, and she still repetitively checks to make sure no one has broken into her home, but she said that these thoughts and feelings are less intense and that she does not feel so "frenzied." She denies having any current thoughts about or plans to harm herself. She said that she is sleeping about 2 hours more per night (now about 5 or 6 hours per day) and the "murmurs" . . . now seem "further away." She. . .does not feel so out of control. Indeed, she laughed heartily on at least 3 occasions during this

_____

[24] Quetiapine is an atypical antipsychotic used to treat the symptoms of schizophrenia, episodes of mania, or depression in patients with bipolar disorder. Venlafaxine is used to treat depression, generalized anxiety disorder, social anxiety disorder, and panic disorder; it is in a class of medications called selective serotonin and norepinephrine reuptake inhibitors which increase the amounts of serotonin and norepinephrine, natural substances in the brain that help maintain mental balance. Topamax (topiramate) is an anticonvulsant used with other medications to treat certain types of seizures. Trazodone is used to treat depression, lorazepam is used to treat anxiety, and temazepam is used on a short-term basis as a sleeping aid. *See* the National Institute of Medicine's on-line website, Medline Plus, at www.nlm.nih.gov/medlineplus/druginfo (last visited November 2, 2007).

session - a marked departure from her presentation in our last session. She said that she had discussed the possibility of hospitalization with her uncle last week and he agreed that he would take care of her two children if it should prove necessary. For now, however, she does not feel a need for hospitalization.

(Tr. 387.)

Based on this series of reports, the Court questions the ALJ's conclusion that as of September 23, 2004, Ms. Welsh was "essentially normal." Although Dr. Reardon wrote that she seemed "markedly improved" on September 23 as compared to September 15, in context, that improvement must be measured from an averted suicide attempt, feelings of paranoia about intruders, including auditory hallucinations and obsessive checking behaviors, and an overall condition which prompted discussion about in-patient treatment and making plans for such a contingency. It is true that by September 23, the "murmurs" seemed farther away and her paranoid belief that people were about to break into her home was "less intense," but those thoughts still existed and can hardly be described as "essentially normal."

Moreover, based on the VA records, the ALJ concluded that Plaintiff's "ability to tolerate stress improved at least to the point that she could perform work within the confines of her residual functional capacity as found herein." (Tr. 19.) Again, we find this conclusion without foundation and a substitution of his own lay opinion for that of Dr. Kelly. When interviewed by Dr. Wheeler in June 2003, Plaintiff did not report obsessive behaviors, auditory hallucinations, suicidal thoughts or behaviors, all of

34

which she did report in September 2004. Contrary to the ALJ's conclusion that the evidence of record showed that Plaintiff's depression was "brief" and "situational," resulting in "only temporary" limitations, the record taken as a whole shows that Dr. Wheeler found her unable to tolerate the stresses of the work environment in June 2003 and exactly a year later, Dr. Kelly found her markedly unable "to work a normal eight-hour workday without psychologically-based interruptions or distractions." (Tr. 351.)

## V.  FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

This Court is cognizant that its role does not include a re-weighing of the evidence presented to the ALJ. However, our role does extend to "considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's findings." Monsour Medical Center, 806 F.2d at 1191. We must also determine if the ALJ properly applied the law, "a cardinal principle" of which is that "the ALJ accord treating physicians' reports great

weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."   Morales, 225 F.3d at 317 (internal citations and quotations omitted).   Another such principle is that the ALJ may "reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion."   Id. Here, we find that the ALJ failed to observe either of these principles.

However, rather than award benefits by imposing our own conclusions about the severity of Plaintiff's disability, we believe the case must be remanded for further consideration.   In particular, we recommend an up-to-date consultative examination and consideration of Plaintiff's entire medical record after September 22, 2002, through the date of the examination.   In his decision, the ALJ should also properly apply the criteria of Listings 12.04 and/or 12.06.

An appropriate order follows.

November ___9___ , 2007

William L. Standish
United States District Judge

cc:   Counsel of Record

36